(Nos. 80182, 80184 cons.—

(No. 80246.—

*In re* ESTATE OF JOHN F. WELLMAN (Samuel H. Young, Appellant; Patrick T. Murphy, Appellee).

*Opinion filed October 18, 1996.—Rehearing denied December 2, 1996.*

BILANDIC, C.J., took no part.
HEIPLE, J., joined by McMORROW, J., concurring in part and dissenting in part.

Robert J. Downing, of Miller, Forest & Downing, Ltd., of Glenview, for Samuel H. Young, executor, appellant.

Samuel H. Young, of Lincolnwood, appellant *pro se.*

Patrick T. Murphy, Public Guardian, and Lee Ann Lowder, Assistant Public Guardian, of the Office of the Cook County Public Guardian, of Chicago, appellee.

JUSTICE FREEMAN delivered the opinion of the court:

These consolidated appeals arise out of a series of

events during the last years in the life of John Wellman. He executed a durable power of attorney, in which he appointed his attorney, Samuel Young, as his agent. Wellman also established joint tenancies with Young in several accounts. The circuit court of Cook County: adjudicated Wellman mentally disabled and appointed Patrick Murphy, the public guardian of Cook County, as Wellman's plenary guardian; restored Wellman to competency and discharged Murphy; and granted Murphy leave to appeal as Wellman's plenary guardian. Wellman died. Lastly, the trial court granted the fee petition of Wellman's guardian *ad litem*.

In an unpublished order (Nos. 1—90—3008, 1—90—3011, 1—91—2055, 1—92—1983 cons. (unpublished order under Supreme Court Rule 23)), the appellate court: held that Murphy had standing to appeal, severed the joint tenancies, upheld the fee award to Wellman's guardian *ad litem*, and held that Wellman's death rendered moot the parties' remaining issues on appeal. We allowed leave to appeal (155 Ill. 2d R. 315(a)). We now reverse the appellate court's severance of the Wellman-Young joint tenancies, and affirm the appellate court's upholding of the guardian *ad litem*'s fee award and dismissal of the remaining issues.

## BACKGROUND

The record contains the following facts that are pertinent to our disposition of the issues raised on appeal. John Wellman was born in 1900. A certified public accountant, he was a self-employed businessman and stock trader during his lifetime. By early 1990, he had accumulated assets totalling approximately $850,000, of which $650,000 were invested in United States Treasury bills, savings and checking accounts, and stock.

Samuel Young was admitted to the Illinois bar in 1948. In 1986, Wellman first employed Young concern-

ing the probate of an estate. Wellman was the executor of the estate; he had been a joint tenant with the testator in certain accounts. Wellman continued using Young's services concerning, *inter alia*, tax preparation, real estate matters, and the management of Wellman's property.

In a letter to Young dated March 21, 1988, Wellman stated in writing what he had previously told Young on "many occasions." Wellman, having no family, asked for Young's assistance in handling his financial affairs. Wellman also wanted Young to look after his affairs if he should become incapacitated. On December 27, 1988, Wellman executed a durable power of attorney in which he appointed Young as his agent. See generally 755 ILCS 45/1—1 *et seq.* (West 1992). Wellman granted Young broad authority to act for him whether competent or incompetent.

On December 1, 1989, Wellman and Young exchanged two letters. The first letter, from Wellman to Young, confirmed: Wellman's previous request for Young to assist him in managing his property, Young's agreement to provide such assistance, and, in consideration thereof, Wellman's promise to place his property in joint tenancy with Young with right of survivorship. Also, during Wellman's life, all of the assets and income would be used for Wellman.

The second letter, from Young to Wellman, acknowledged: Wellman's decision to make Young his "partner" in managing his property, Wellman's decision to place his property in joint tenancy with Young to avoid probate, Young's agreement to look after Wellman and to see that Wellman had medical and health care, Young's agreement not to spend or use Wellman's property for any purpose other than for Wellman's benefit, and Wellman's power to revoke the joint tenancies at any time and to make gifts to others at his death.

On December 7, 1989, Wellman and Young visited the Northern Trust Bank in Chicago. They spoke to Paul Larson, who had been Wellman's personal banker since 1984. Wellman and Young instructed Larson to place Wellman's savings and checking accounts in joint tenancy. Larson refused. Eventually, Wellman and Young closed the account, totalling $188,000, but returned when the bank agreed to the Wellman-Young joint accounts.

After visiting the Northern Trust Bank, Wellman and Young went to the Federal Reserve Bank in Chicago. They spoke to Andrew Vlahos, who had served Wellman since 1985. They discussed Wellman's United States Treasury Direct Account and joint tenancy with Young. On January 30, 1990, the account was placed in the name of Wellman and Young in joint tenancy with right of survivorship.

In December 1989, Vlahos contacted Assistant Illinois Attorney General Ann Parisi. Vlahos told Parisi that Young possibly was exploiting Wellman. On December 21, 1989, Parisi visited Wellman to investigate whether any laws had been violated and whether Wellman had been financially exploited in any way.

On January 7, 1990, the Illinois Attorney General's office referred the matter to the Cook County public guardian's office to investigate whether Wellman needed a guardian. On March 30, 1990, Murphy petitioned the trial court to be appointed plenary guardian of Wellman's person and estate. On April 3, 1990, the trial court appointed Sandra Thiel as Wellman's guardian *ad litem*. On May 8, 1990, at the close of a hearing, the trial court adjudicated Wellman mentally disabled and appointed Murphy plenary guardian of Wellman's person and estate. On May 24, 1990, the trial court, granting Murphy's petition, entered an order freezing the Wellman-Young joint accounts at the Northern Trust Bank.

On June 13, 1990, Young petitioned the trial court to vacate the appointment of the plenary guardian for Wellman. In a separate filing, Young petitioned the court to vacate the order freezing the bank accounts. On June 14, 1990, Wellman's attorney, Robert Downing, petitioned the trial court to restore Wellman to competency and discharge Murphy and Thiel, and to vacate the order freezing the bank accounts. Also, on June 24, 1990, Downing moved to vacate the May 8, 1990, guardianship order specifically because it violated Wellman's due process rights and the durable power of attorney.

On July 13, 1990, Murphy moved to dismiss Young's petition to vacate the appointment of a plenary guardian for Wellman. In a separate filing, Murphy moved to dismiss Downing's petition to restore Wellman. Murphy also filed answers to Young's and Downing's petitions. On July 24, 1990, Murphy petitioned the trial court to: (1) revoke the durable power of attorney in which Wellman appointed Young as his agent, and (2) sever all of the joint tenancy accounts.

On September 12, 1990, Murphy moved for summary judgment on Young's and Downing's petitions to vacate the guardianship order. On September 19, Young cross-moved for summary judgment on his petition.

In orders entered on October 16 and 17, 1990, the trial court granted Murphy's motion for summary judgment and denied Young's and Downing's petitions on most issues. On October 19, 1990, Downing (Docket No. 1—90—3008) and Young (Docket No. 1—90—3011) each appealed from the trial court's denial of their respective petitions.

From January 7 through March 28, 1991, the trial court held hearings on Murphy's July 24, 1990, petition to revoke the durable power of attorney and sever the joint tenancies. On May 8 through 10, 1991, the court

held hearings on Downing's June 14, 1990, petition to restore Wellman.

On June 3, 1991, the trial court entered a "final judgment order" dismissing Murphy's petition and granting Downing's petition. The court terminated the adjudication of mental disability, restoring Wellman to competency. The court also vacated its order freezing the Northern Trust Bank accounts.

On June 12, 1991, Murphy filed in the trial court a "Motion for Leave to Appeal" to the appellate court. In the motion, Murphy acknowledged that by terminating the adjudication of mental disability, the trial court restored Wellman to competency and discharged Murphy as his guardian. Murphy further stated:

"3. That having been discharged as guardian of the estate and person of John F. Wellman, the Public Guardian has no standing to act on behalf of the estate in any respect including appeal of the June 3, 1991, final judgment order.

4. That it would be a circumvention of the Illinois Supreme Court Rules and clearly against their spirit and intent to deny the estate any opportunity to appeal from this final judgment order.

5. That there is no other party available to take an appeal of such order other than the Public Guardian of Cook County.

6. That the Public Guardian will not seek any fees from the estate of John F. Wellman for any work on the appeal.

WHEREFORE, the Public Guardian of Cook County respectfully requests leave of this court to prosecute an appeal, on behalf of the estate of John F. Wellman, of this court's final judgment order entered on June 3, 1991."

The trial court entered an order stating in pertinent part that Murphy, as Wellman's plenary guardian of Wellman's estate, was granted leave to appeal from the final judgment order "on behalf of the estate."

On June 28, 1991, Murphy filed his notice of appeal in the appellate court (Docket No. 1—91—2055). Mur-

phy asked the appellate court to reverse the trial court's final judgment order and empower the guardian to revoke the agency agreement between Wellman and Young, reverse the trial court's restoration of Wellman, hold that the Young-Wellman joint tenancies are null and void, and order all accounts to revert back to the sole ownership of Wellman.

On July 3, 1991, Murphy filed in the trial court a first and final account of Wellman's estate. Murphy distributed to Young $955.23, which was the balance of the cash receipts and disbursements that Murphy handled during the guardianship. The trial court approved the final account, formally discharged Murphy as plenary guardian of the person and estate of Wellman, and closed the estate.

On August 17, 1991, Wellman died. Around August 28, Young formally reported Wellman's death to the trial and appellate courts, Downing, and Murphy. On October 2, 1991, Wellman's will was admitted to probate and Young was appointed executor.

On January 30, 1992, Thiel, Wellman's guardian *ad litem*, petitioned the trial court for a fee award of $4,843 to "be paid from the funds" of Wellman. Young moved to dismiss. On April 15, 1992, the trial court denied Young's motion to dismiss and awarded Thiel fees in the amount requested. Young appealed from the fee award (Docket No. 1—92—1983).

The appellate court consolidated the four separate appeals. On February 17, 1993, the court heard oral argument and, on March 15, 1995, issued an unpublished order (134 Ill. 2d R. 23). The court held that Wellman's death rendered moot most of the issues raised on appeal. However, the appellate court held that Murphy's discharge as Wellman's plenary guardian, or Wellman's subsequent death, did not deprive Murphy of standing to appeal from the denial of his petition to

sever the joint tenancies. The appellate court then reversed the trial court and severed the joint tenancies. The court also upheld the fee award to Thiel. Young, Downing, and Murphy all appeal.

## DISCUSSION

Before this court, Downing and Young continue their piecemeal appellate litigation style. In cause No. 80182, Downing appeals from the appellate court's severance of the joint tenancies. In cause No. 80184, Young appeals from the trial court's initial adjudication of Wellman as mentally disabled, and the appellate court's severance of the joint tenancies. Murphy, responding in these causes, cross-appeals from the trial court's restoration of Wellman. In cause No. 80246, Young appeals from the appellate court's judgment upholding the trial court's fee award to Thiel. We consolidated these causes for review.

### Murphy's Standing to Appeal Joint Tenancies

Young and Downing contend that the appellate court erred in severing the Wellman-Young joint tenancies. Each initially argues that Murphy lacked standing to appeal from the denial of his petition to sever the joint tenancies.

The doctrine of standing requires that a party, either in an individual or representative capacity, have a real interest in the action brought and in its outcome. The purpose of the doctrine is to ensure that courts are deciding actual, specific controversies and not abstract questions or moot issues. *In re Marriage of Rodriguez,* 131 Ill. 2d 273, 279-80 (1989); see 59 Am. Jur. 2d *Parties* §§ 30, 31 (1987). Standing "is not simply a procedural technicality" (59 Am. Jur. 2d *Parties* § 30, at 416 (1987)), but rather is an aspect or a component of justiciability. *In re Estate of Burgeson,* 125 Ill. 2d 477, 485 (1988); *Weihl v. Dixon,* 56 Ill. App. 3d 251, 253 (1977).

The essence of the inquiry regarding standing is whether the litigant, either in an individual or representative capacity, is entitled to have the court decide the merits of a dispute or a particular issue. *Helmig v. John F. Kennedy Community Consolidated School District No. 129*, 241 Ill. App. 3d 653, 658 (1993). This court has repeatedly held that standing requires some injury in fact to a legally recognized interest. *Rodriguez*, 131 Ill. 2d at 280 (and cases cited therein).

We agree with Young and Downing that Murphy lacked standing to appeal from the denial of his petition to sever the Wellman-Young joint tenancies. We note that our conclusion is based on established guardianship principles, and that Murphy, as a public guardian, "has all the powers and duties of any other guardian appointed under the Probate Act of 1975." *Burgeson*, 125 Ill. 2d at 486. The occurrence of two events deprived Murphy of standing. First, the trial court restored Wellman to competency and discharged Murphy. Second, Wellman died. 755 ILCS 5/24—12 (West 1992).

*Wellman's Restoration*

Murphy himself acknowledged to the trial court in his motion for leave to appeal that the court restored Wellman and discharged Murphy. He also admitted that, as a result, he had "no standing to act on behalf of the estate in any respect including appeal of the June 3, 1991, final judgment order."

However, the trial court granted Murphy leave to appeal "on behalf of the estate." The appellate court held that Murphy had standing to appeal, reasoning:

"We first find that the Public Guardian had standing to appeal the denial of his petition to sever the joint tenancies. The Public Guardian had an interest in seeking that relief because the Public Guardian had been appointed plenary guardian of Wellman and because he believed that his ward was incapable of handling his own affairs.

The discharge of the Public Guardian did not deprive the Public Guardian of the ability to appeal an adverse ruling."

This reasoning was erroneous. Murphy correctly acknowledged that Wellman's restoration deprived him of standing to appeal. The Probate Act of 1975 does not provide for the *automatic* termination of a guardianship for a disabled ward as in the case of a guardianship for a minor ward who reaches the age of majority (see 755 ILCS 5/11—14.1 (West 1992)). Rather, the Act requires the trial court to hold a hearing on the petition of the ward, someone on the ward's behalf, or on the court's own motion, to revoke or modify the guardianship. 755 ILCS 5/11a—20, 11a—21 (West 1992). At the close of the hearing, the court may: "(1) dismiss the petition; (2) terminate the adjudication of disability; (3) revoke the letters of guardianship of the estate or person, or both; (4) modify the duties of the guardian; and (5) make any other order which the court deems appropriate and in the interests of the ward." 755 ILCS 5/11a—21(c) (West 1992).

In *Hoff v. Meirink*, 12 Ill. 2d 108, 111 (1957), this court stated:

"While it is clear that a restoration to competency does not *ipso facto* terminate the office of the conservator, it by no means follows that the probate court can continue to exercise its supervisory power over the property of the ward after the ward has been restored to competency and until the conservator's office terminates. Indeed, serious constitutional questions would be presented by a statute that provided for the exercise of supervisory power after the ward's disability had been removed. We find no such provision in the Probate Act."

The appellate court has correctly read *Hoff* as "authority for the general proposition that a restored ward becomes reinvested with the rights he lost when adjudicated an incompetent." *In re Estate of Hayden*, 105 Ill. App. 3d 60, 65 (1982). Upon the restoration of a mentally

disabled ward, the ward has the right to be put in possession of his or her property, and to ask the court to order the guardian to deliver to the ward all of the ward's money and property that the guardian has, or the money and property to which the ward is entitled. *In re Estate of Berger*, 166 Ill. App. 3d 1045, 1055 (1987).

Following the restoration of a ward, the now-competent former ward is capable of representing, and has the right to represent, his or her own interests. Thus, the guardian no longer has standing to represent in court the interests of the former ward. *Hayden*, 105 Ill. App. 3d at 63-66.

Further, we agree with long-established authority that upon a ward's restoration, the guardian lacks standing to appeal therefrom. *In re Guardianship of Love*, 19 Ohio St. 2d 111, 249 N.E.2d 794 (1969) (and cases cited therein); see, *contra*, *Cobb v. South Carolina National Bank*, 210 S.C. 533, 43 S.E.2d 465 (1947). Courts reason that the guardian lacks a legally sufficient interest in the ward's restoration to allow the guardian to contest it on appeal. The guardian " 'is simply a trustee and can have no interest in this regard adverse to the recovery of sanity by the ward.' " *Love*, 19 Ohio St. 2d at 114-15, 249 N.E.2d at 796, quoting *Ensign v. Flaxon*, 224 Mass. 145, 150, 112 N.E. 948, 950 (1916).

This reasoning is quite settled in Illinois. The appointment of a guardian creates the relation of trustee and beneficiary between the guardian and the ward. The estate becomes a trust fund for the ward's support. *Lewis v. Hill*, 387 Ill. 542, 545 (1944). The guardian only acts as the hand of the court and is at all times subject to the court's direction in the manner in which the guardian provides for the care and support of the disabled person. *In re Estate of Nelson*, 250 Ill. App. 3d 282, 287 (1993).

Also, guardianship proceedings are not, strictly

speaking, adversarial. The trial court protects the disabled person as its ward, vigilantly guarding the ward's property and viewing the ward as a favored person in the eyes of the law. The court functions in a central role, which permits it to oversee and control all aspects of the management and protection of the disabled person's estate. The court controls the ward's person and estate, and directs the guardian's care, management, and investment of the estate. *Berger*, 166 Ill. App. 3d at 1055. The sole issue facing the trial court in a restoration proceeding is the mental condition and the best interests of the ward. See *Love*, 19 Ohio St. 2d at 114, 249 N.E.2d at 795. Thus, based on the foregoing principles, and contrary to the appellate court's reasoning, the trial court's restoration of Wellman cannot be considered to be such an "adverse ruling" to Murphy as to allow him to appeal therefrom.

We note that Murphy characterizes the final judgment order as only partially restoring Wellman. Thus, according to Murphy, his relationship to Wellman should not have ended, providing him with standing to appeal. Murphy points to the final judgment order, in which the trial court found "that John F. Wellman [was] a partially disabled person who lacks some but not all of the capacity as specified in [755 ILCS 5/11a—3 (West 1992)] and, therefore, is entitled to the appointment of a limited guardian of the person and estate." The court also found that Wellman lacked the "capacity to perform the tasks necessary for the routine care and safety of his person or for the tasks incidental to the paying of bills, writing checks, making purchases and managing his estate at that level of performance."

However, the trial court terminated the adjudication of mental disability. In addition to the above-quoted finding, the court also found that: the extent of Wellman's confusion or dementia varied due to his anemia

and blood transfusions, and that drug therapy had helped with those conditions; Wellman had the mental ability to communicate with his physician, to understand his mental and physical conditions, and to make responsible decisions concerning his health care; and that Wellman had the mental ability to make and communicate responsible decisions concerning the control, investment, and management of his financial affairs and the disposition of his estate. The trial court also found that Wellman understood the nature and consequences of placing his accounts in joint tenancy with Young, had the requisite mental capacity to enter into the transactions, and was capable of controlling or revoking the agency relationship with Young.

These findings show that the trial court found Wellman to be a partially disabled person, but not yet in need of a guardian over his estate. With help from others, *i.e.*, Young, his agent, Wellman was able to direct and manage his affairs and estate. See *In re Estate of Galvin*, 112 Ill. App. 3d 677, 681 (1983), quoting *In re Estate of Mackey*, 85 Ill. App. 3d 235, 238 (1980). Of course, the question of Wellman's mental disability was a uniquely factual question for the trial court, whose findings will not be disturbed on review unless they are against the manifest weight of the evidence. See *Galvin*, 112 Ill. App. 3d at 681-82.

When the trial court restored Wellman on June 3, 1991, the reason for the State's interference with his affairs ceased. See *In re Estate of Hire*, 309 Ill. App. 566, 568 (1941), *rev'd on other grounds*, 379 Ill. 201 (1942). The only function for Murphy to perform was to account for Wellman's estate and deliver it to Wellman. The existence or absence of Wellman's next of kin neither diminished nor enlarged Murphy's role as guardian.

On July 3, 1991, a few days after Murphy filed his

notice of appeal, he filed his account of Wellman's estate. The trial court approved the account, formally discharged Murphy as plenary guardian of Wellman's person and estate, and closed the estate. Contrary to the trial court's grant of leave to appeal, Murphy could not appeal "on behalf of the estate." After July 3, 1991, Murphy's relationship to Wellman's money and property ceased to exist. In terms of our definition of standing, after Wellman was restored and Murphy was discharged, Murphy could no longer claim an injury in fact to a legally recognized interest. See *Burgeson*, 125 Ill. 2d at 487.

### Wellman's Death

If Wellman's restoration and Murphy's discharge, standing alone, did not deprive Murphy of standing to appeal, then they certainly did when considered with Wellman's death. However, the appellate court reasoned that "[a]s Wellman's property held in joint tenancy remains, we hold that the issue whether the denial of the petition to sever the joint tenancies was error is not moot."

This reasoning was erroneous. Not only did Wellman's death render moot the issue of whether the trial court erred in denying Murphy's petition to sever the joint tenancies, but Wellman's death also deprived Murphy of standing to assign the error.

The general rule is that a guardianship necessarily terminates by the death of the ward. 57 C.J.S. *Mental Health* § 146, at 45, § 158, at 55 (1992); 39 Am. Jur. 2d *Guardian & Ward* § 54 (1968). Contrary to the appellate court's reasoning, although Wellman's property remained after his death, at issue is Murphy's *relationship to* that property. Murphy was the guardian of Wellman's estate. That relationship ended at the latest on July 3, 1991, when Murphy was formally discharged, or on August 17, 1991, when Wellman died.

Section 24—12 of the Probate Act of 1975 accords with the general rule that a guardianship terminates with the death of the ward, but subject to section 24—19. 755 ILCS 5/24—12 (West 1992). Section 24—19(a) provides: "Without order of appointment and until the issuance of letters testamentary or of administration *or until sooner discharged by the court*, a representative of the estate of a deceased ward has the powers and duties of an administrator to collect." (Emphasis added.) 755 ILCS 5/24—19(a) (West 1992). In the present case, Murphy was discharged prior to Wellman's death. Accordingly, the general rule applies.

The appellate court's order lacks any reference to this court's decision in *Burgeson*, where the court applied this reasoning against Murphy. This court held that "Murphy's duties as Burgeson's guardian terminated upon her death." *Burgeson*, 125 Ill. 2d at 487. We further held that Murphy had a legally recognizable interest that existed following Burgeson's death—an unpaid creditor of the estate. However, that interest terminated once Murphy's office received its fees in the final account of the estate. *Burgeson*, 125 Ill. 2d at 487-88; 755 ILCS 5/18—10 (West 1992).

Murphy unsuccessfully attempts to distinguish the present case from *Burgeson*. Murphy first argues that in *Burgeson* the decedent's estate was closed, while Wellman's estate is in probate and a will contest is pending. Thus, "the decedent's estate in this case has not been closed." However, Murphy's relationship to Wellman's person and estate was closed on July 3, 1991, when Murphy was formally discharged. Murphy also characterizes himself as an unpaid creditor. However, he filed his final account of the estate, which the trial court approved. Also, in his motion for leave to appeal, Murphy stated to the trial court that he would not seek any fees from Wellman's estate for work on the appeal. *Burgeson* controls the outcome of this issue.

Murphy raises serious allegations impugning the professional conduct of Young. If Murphy suspects Young of unethical conduct, then he, like anyone else, can complain to the Attorney Registration and Disciplinary Commission. See *Burgeson*, 125 Ill. 2d at 488. However, we hold that Wellman's restoration and death deprived Murphy of standing to appeal from the denial of his petition to sever the Wellman-Young joint tenancies. Consequently, the appellate court erred in severing the joint tenancies.

### Guardian *Ad Litem* Fees

"A guardian ad litem *** is entitled to such reasonable compensation as may be fixed by the court to be taxed as costs in the proceedings and paid in due course of administration." 755 ILCS 5/27—4 (West 1992). However, Young contends that the appellate court erred in upholding the trial court's fee award to Thiel. We note two surprising arguments of Young. He first argues that the trial court lacked authority to award Thiel fees from the funds of Wellman because she petitioned the court for fees "six months after the Estate was closed and all assets of $955.23 distributed." Young also argues that "[t]he size of this estate, $955.23, shows that an award of $4,843.75 is excessive."

These arguments completely lack merit. Of course, Wellman's "estate," in the context of his adjudication of mental disability, was not limited to the balance of the cash receipts and disbursements that Murphy handled during the guardianship. Rather, Wellman's "estate" during the time of his adjudication of disability consisted generally of all of his real and personal property (see Black's Law Dictionary 547 (6th ed. 1990), citing Uniform Probate Code § 1—201(11); accord *In re Estate of Anderson*, 195 Ill. App. 3d 644, 650 (1990)), which totalled in the hundreds of thousands of dollars. Thiel was properly awarded fees from the assets that she was

appointed to protect. See *People v. Pasfield*, 284 Ill. 450, 458 (1918); *Nelson*, 250 Ill. App. 3d at 288.

The questions of who must pay guardian *ad litem* fees and in what amount rest within the discretion of the trial court. See *In re Estate of Dyniewicz*, 271 Ill. App. 3d 616, 622-23 (1995); *Chicago Title & Trust Co. v. Czubak*, 52 Ill. App. 3d 986, 989 (1977); *Merneigh v. Merneigh*, 2 Ill. App. 2d 352, 356 (1954). In the present case, the trial court found that Thiel's hourly rate and the number of hours that she billed were reasonable and necessary. We cannot say that the trial court abused its discretion in granting Thiel's fee petition.

## Remaining Issues

We also agree with the appellate court that Wellman's death rendered moot the numerous remaining issues raised by the parties. "A case can become moot when, pending the decision on appeal, events occur which render it impossible for the reviewing court to grant effectual relief to either party." *Bluthardt v. Breslin*, 74 Ill. 2d 246, 250 (1979). The existence of a real controversy is an essential prerequisite to appellate jurisdiction. Where the issues involved in the trial court no longer exist, an appellate court will not review the cause merely to decide moot or abstract questions, to determine costs, or to establish a precedent. When, pending an appeal from a judgment of a lower court, an event occurs that renders it impossible for a court of review to grant any effectual relief, the court will dismiss the appeal. *La Salle National Bank v. City of Chicago*, 3 Ill. 2d 375, 378-80 (1954); *Tuttle v. Gunderson*, 341 Ill. 36, 45-46 (1930).

In the present case, the appeals of Downing, Young, and Murphy were pending in the appellate court when Wellman died on August 17, 1991. Downing contended, *inter alia*, that the adjudication of Wellman as mentally disabled violated Wellman's due process rights. Young

also contended, *inter alia*, that the adjudication of mental disability was void for several reasons. Murphy contended, *inter alia*, that Wellman's restoration was against the manifest weight of the evidence.

Wellman was the person who was allegedly improperly adjudicated mentally disabled, and was the person who was allegedly improperly restored. These issues obviously became moot with Wellman's death.

For the foregoing reasons, the judgment of the appellate court in cause Nos. 80182 and 80184 is reversed insofar as it severed the Wellman-Young joint tenancies, and affirmed insofar as it dismissed the remaining issues; the judgment of the appellate court in cause No. 80246 is affirmed.

> *Nos. 80182, 80184—Appellate court affirmed in part*
> *and reversed in part;*
> *circuit court affirmed.*
> *No. 80246—Affirmed.*

CHIEF JUSTICE BILANDIC took no part in the consideration or decision of this case.

JUSTICE HEIPLE, concurring in part and dissenting in part:

Having initially been adjudicated to be an incompetent, Mr. Wellman was made a ward of the court and a guardian was appointed. Later, the wardship was terminated and the guardian was discharged. The guardian appealed. Soon thereafter, Mr. Wellman died.

The majority opinion holds, in part, that the termination of the wardship and the discharge of the guardian deprived the guardian of his standing to appeal. I disagree as a matter of public policy. Trial courts can be wrong. In this case, for instance, if the trial court was in error and misperceived Mr. Wellman's true condition, the only way to protect his estate and to remedy the situation would be to afford the discharged guardian a

right to appeal. We know, in fact, that, at an earlier time, Mr. Wellman was found to be elderly, ill, confused, and unable to properly care for himself. Surely, a restoration decision should at least be subject to the possibility of review. Otherwise, an erroneous order of restoration might facilitate the wasting and dissipation of the former ward's estate. If, as the majority rules, the former guardian has no right to take an appeal, then, quite simply, there is no appeal since no one else is in a position to bring it.

I, of course, agree with the majority's position that the death of the ward terminated the guardian's standing to appeal. However, on the salient and important point of whether a guardian should be allowed to appeal a restoration order, I respectfully dissent. As a matter of public policy, a guardian should retain the right to appeal the restoration of a person previously declared to be incompetent.

JUSTICE McMORROW joins in this partial concurrence and partial dissent.